1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

MICHELLE LYNN BURNELL,                      CASE NO. C22-0265JLR

11                     Plaintiff,            ORDER

       v.

12

13   LEWIS BRISBOIS BISGAARD &
     SMITH LLP, et al.,

14
                       Defendants.

15

16                          I.    INTRODUCTION

17        Before the court are: (1) Defendants Lewis Brisbois Bisgaard & Smith LLP

18   ("Lewis Brisbois"), Heather M. Jensen, and AnneMarie McDowell's (collectively,

     "Defendants") motion for summary judgment (Defs. MSJ (Dkt. # 96); Defs. Reply (Dkt.

19
     # 113); (2) *pro se* Plaintiff Michelle Lynn Burnell's cross-motion for summary judgment

20

21

22

ORDER - 1

1   (Burnell MSJ (Dkt. # 100); Burnell Reply (Dkt. # 115)[1]); and (3) Defendants' motion to

2   strike certain text messages attached to Ms. Burnell's filings (Defs. Surreply (Dkt.

3   # 126)). Each party opposes the other party's motion for summary judgment. (Defs.

4   Resp. (Dkt. # 105); Burnell Resp. (Dkt. # 108)).

5        The court has considered the parties' motions, submissions, the relevant portions

6   of the record, and the governing law. Being fully advised,[2] the court GRANTS

7   Defendants' request to STRIKE the attachments to Ms. Burnell's reply in support of her

8   motion for summary judgment, exercises its discretion to STRIKE the six subsequent

9   replies filed by Ms. Burnell and their attachments, DENIES Ms. Burnell's motion for

10  summary judgment, and GRANTS Defendants' motion for summary judgment.

11                          **II.    BACKGROUND**

12       This case involves an employment dispute that arose during the COVID-19

13  pandemic. Ms. Burnell alleges that she became disabled while working for Lewis

14  Brisbois, after being told to work from home. (*See* Am. Compl. (Dkt # 35) ¶¶ 1.1, 4.1,

15  4.2, 4.6, 4.7, 4.8, 4.10; Burnell MSJ at 2-3.) She also asserts that she experienced

16  retaliation and a hostile work environment after reporting a coworker, Grace Kositzky,

17  for coughing in the office, and that Ms. Burnell eventually had a meeting with the

18  _____

19       [1] Over the course of three days, Ms. Burnell filed a reply in support of summary judgment (Dkt. # 115) and six additional, identical copies of that reply, each attaching a different

20  set of documents. (*See* (Dkt. ## 116-121).) The court will refer to the first-filed reply as Ms. Burnell's reply.

21       [2] Defendants do not request oral argument, and Ms. Burnell makes only a conditional request for oral argument. (*See* Burnell Resp. at 23.) The court concludes that oral argument would not be helpful to its disposition of the motions. *See* Local Rules W.D. Wash. LCR

22  7(b)(4).

1    individual Defendants, Ms. Jensen and Ms. McDowell, after which her mental health

2    started to rapidly decline.  (*See* Burnell at MSJ 2-4.)  In this lawsuit, Ms. Burnell asserts a

3    bevy of claims against Defendants, including employment discrimination, harassment,

4    retaliation, negligent hiring or retention, intentional infliction of emotional distress, and

5    various constitutional claims.  The court sets forth the relevant factual and procedural

6    background below.

7    **A.    Factual Background**

8         Lewis Brisbois hired Ms. Burnell as a legal secretary in its Seattle office in March

9    2019.  (*See* Burnell Resp. at 3.)  Ms. Burnell's responsibilities included supporting

10   attorneys, ensuring that legal documents were properly served, and reading and

11   understanding the local rules of courts in Washington. (6/16/22 Jensen Decl. (Dkt. # 26)

12   ¶ 4.)  In March 2020, Lewis Brisbois implemented a plan for remote work at its Seattle

13   office in response to the COVID-19 pandemic.  (9/20/24 Bowers Decl. (Dkt. # 99) ¶¶ 3-4,

14   Ex. B (revised remote work plan).)  This plan provided, among other things, that Stacy

15   Bowers (the office administrator) and a "skeleton crew" of eight administrative staff

16   members would continue to report to the Seattle office during regular business hours.

17   (*Id.*)  Other non-attorney employees were "strongly encouraged" to stay home, and the

18   plan cautioned employees generally that "[u]nder no circumstances should you come in if

19   you are sick or if someone you live with is sick."  (*Id.*)

20        Although Ms. Burnell was not on the skeleton crew, (9/20/24 Bowers Decl. ¶¶ 4-5,

21   Exs. B-C), she voluntarily continued to come into the office in March 2020.  (9/20/24

22   Slocum Decl. (Dkt. # 97) ¶ 3, Ex. B (March 16, 2020 email from Ms. Burnell).)  This was

1    in part because she wanted to catch up on her work (*id.*), and in part because she did not

2    want to remain at home and did not have the tools she needed to succeed in her role while

3    working remotely.  (9/20/24 Slocum Decl. ¶ 2-3, Ex. A ("Burnell Dep.") at 68:6-13,

4    71:20-25, Ex. B.)

5          A few days after Ms. Burnell volunteered to work from the office, on March 23,

6    2020, Governor Jay Inslee signed Proclamation 20-25, ordering "[a]ll people in

7    Washington State" to "immediately cease leaving their home or place of residence

8    except:  (1) to conduct or participate in essential activities, and/or (2) for employment in

9    essential business services."  (9/20/24 Slocum Decl. ¶ 4, Ex. C at 25, 27.[3])  "Employment

10   in essential business services" was defined as "an essential employee performing work

11   for an essential business . . . or carrying out minimum basic operations . . . for a non-

12   essential business."  (*Id.* at 27.)  On March 24, 2020, one day after Governor Inslee

13   signed the proclamation, Ms. Bowers sent an office-wide email instructing employees

14   that "unless you are part of the skeleton crew who are required to be here, you should not

15   come into the office."  (9/20/24 Bowers Decl. ¶ 5, Ex. C.)

16         On April 2, 2020, Governor Inslee signed Proclamation 20-25.1, extending the

17   provisions of his previous stay-at-home order to May 4, 2020 because of "continued

18   worldwide spread of COVID-19" and because of increases in the number of confirmed

19   COVID-19 cases and associated deaths in Washington State.  (9/20/24 Slocum Decl.,

20   Ex. C at 30-31.)

21

22         ──────────────
      [3] The court refers to the page numbers in the CM/ECF header when citing the exhibits to
      Ms. Slocum's declaration.

ORDER - 4

1      On April 8, 2020, Ms. Kositzky, one of the skeleton crew members, presented to

2  work with a cough.  (9/20/24 Bowers Decl. ¶¶ 6-7.)  Believing incorrectly that Ms.

3  Kositzky had COVID-19, Ms. Burnell reported her to Ms. Bowers, who sent Ms.

4  Kositzky home for the day.  (*Id.* ¶ 6.)  When Ms. Kositzky returned to work the next day,

5  still coughing, Ms. Burnell again complained to Ms. Bowers, who again sent Ms.

6  Kositzky home.  (*Id*. ¶¶ 6-7.)  The day after that, on April 10, 2020, Ms. Bowers

7  instructed Ms. Burnell to work from home because Ms. Burnell was not an essential

8  employee.[4]  (*Id.* ¶ 8.)  Ms. Burnell received a firm-issued laptop, a desktop monitor, and a

9  Wi-Fi hotspot.  (*Id.*) Lewis Brisbois did not provide this equipment to any other legal

10  secretary.  (*Id.* ¶ 9.)

11      Nevertheless, Ms. Burnell experienced technology challenges while she worked

12  from home.  At the end of April 2020, Ms. Jensen, Lewis Brisbois's managing partner,

13  sent an office-wide email in which she noted that "we are all frustrated with network

14  issues" and that the firm's "IT department . . . continues to focus its work on providing a

15  stable and secure network."  (10/11/24 Jensen Decl. (Dkt. # 107) ¶ 3, Ex. A.)  Three

16  months later, in an email dated July 6, 2020, Ms. Burnell told Ms. Jensen and Greg

17  Worden, the attorney she assisted, that she was still having technical problems with her

18  work-issued laptop, VPN, and wifi hotspot, which "only made [her] productivity

19  worse[.]"  (9/20/24 Jensen Decl. (Dkt. # 98) ¶ 5, Ex. C.)

20

21      [4] Ms. Burnell asserts that Ms. Bowers's real motivation for instructing her to work from home was retaliation for reporting Ms. Kositzky for coughing.  (*See, e.g.*, Burnell MSJ at 4-5;

22  Burnell Reply at 4.)  Ms. Burnell, however, does not point to any admissible evidence rebutting Ms. Bowers's explanation for why she sent Ms. Burnell home.

1    In addition to technological problems, Ms. Burnell also experienced severe anxiety

2    while working from home.  In her July 6 email to Ms. Jensen and Mr. Worden, Ms.

3    Burnell also expressed concerns about a dispute she was having with Ms. Kositzky,

4    which Ms. Burnell said was evidenced by the "nature and tone" of an email that Ms.

5    Kositzky sent to Ms. Burnell.  (*Id.* at 36; *see also id.* at 37 (email from Ms. Kositzky to

6    Ms. Burnell).[5])  She also said that she was experiencing "bad anxiety[,]" "medical

7    issues[,]" and "health issues" as a result of her dispute with Ms. Kositzky, stating, "I

8    cannot help but to feel like I am being 'pushed out[.]'"  (9/20/24 Jensen Decl. ¶ 5, Ex. C.)

9    She asked for assistance in resolving the dispute with Ms. Kositzky, stating, "[t]here are

10    simply too many little things that I am noticing[.]"  (*Id.*)  Ms. Burnell also said that the

11    dispute was close to causing her "a mental breakdown."[6]

12    Separately, Ms. Burnell also replied directly to Ms. Kositzky, accusing her of

13    highlighting Ms. Burnell's failure to finish her work and of implying that she was doing

14    Ms. Burnell's job:

15    Grace –
       Thank you so much for sending this email highlighting my obvious failure
16    in getting these closed files done.  Given your tenure of experience, I can
       imagine you understand that emails sometimes get buried but, we, as legal
17    professionals, understand the importance of making sure tasks such as court
       filings/ deadlines etc…things that are governed by statues, are in strict
18    compliance.  I am welcome to any suggestions you have to help me do my
       job more efficiently for you.

19

20    _____
       [5] The court refers to the page numbers in the CM/ECF header when citing to exhibits to
21    Ms. Jensen's declarations.

       [6] There is no evidence in the record that Ms. Jensen or Mr. Worden replied to or
22    otherwise addressed the concerns Ms. Burnell raised in her July 6 email.

* * *

1

2      [S]ince your since your email to me was basically letting me know that you
       have been doing my job for me, I decided to help you out.  Please see the
3      attached Closed Matter list for you to complete on my behalf.  This should
       keep you busy.  Thanks!
4      Again, thank you so very much for your email as it was super appropriate
       coming from you.  Have a wonderful day and let me know if you have any
5      questions about the list[.]

6    (9/20/24 Bowers Decl. ¶ 11, Ex. D.)  After receiving this email from Ms. Burnell, Ms.

7    Kositzky reported it to Ms. Bowers.  (*Id.*)

8           As the year continued, Ms. Burnell's technological problems persisted, and her

9    anxiety and relationships with coworkers remained difficult to manage.  On August 27,

10   2020, Ms. Burnell sent an email to legal secretary Pandy McVay, copying Ms. Bowers, in

11   which she accused Ms. McVay of taking "jabs" at her on multiple occasions, including

12   by sending an email that "was a diss" to Ms. Burnell and her work product.  (9/20/24

13   Slocum Decl. ¶ 7, Ex. F.)  Ms. Burnell also noted in that message that she did not receive

14   a working computer system until July, that it "literally took [her] almost having a mental

15   breakdown to get a better working system[,]" and that she was seeing a "social worker,

16   therapist[.]"  (*Id.*)  Ms. Burnell then forwarded Ms. McVay's email and her response to

17   Ms. Bowers.  (9/20/24 Bowers Decl. ¶ 12, Ex. E.)  In that email, she stated,

18      Stacy – the day has come where I cannot take it anymore.  I need the firm to
       go to bat for me while I take time off since the firm didn't give a shit about
19     me during the Grace [Kositzky]/Covid thing.

20      I am about to go to the mental health hospital.

21

22

1    (*Id.* at 19.[7])  In response, Ms. Bowers invited Ms. Burnell to a Zoom meeting with her

2    and Ms. Jensen.  (*Id.*)  After Ms. Bowers denied Ms. Burnell's request to have a third

3    party listen in to that meeting, Ms. Burnell responded, "I'm so sorry for everything!  I'm

4    just not doing well at all.  I am so sorry!"  (*Id.*)

5         The next day, August 28, 2020, Ms. Bowers and Ms. Burnell discussed whether

6    Ms. Burnell would take medical leave under the Family and Medical Leave Act

7    ("FMLA").  (9/20/24 Bowers Decl. ¶ 13.)  According to Ms. Bowers, Ms. Burnell

8    "agreed medical leave would be beneficial, apologized . . . for her behavior, [and] stated

9    she hates her life and is destroying everything[.]"  (*Id.*)  Ms. Burnell took FMLA leave

10   from September 1, 2020 through November 30, 2020.  (*Id.* ¶ 14.)

11        While she was on leave, Ms. Burnell continued to email individuals at Lewis

12   Brisbois about the stress and anxiety she continued to experience since being told to work

13   from home.  (*See* 9/20/24 Slocum Decl. ¶¶ 8-9, Exs. G, H.)  In an email to Mr. Worden

14   and Ms. McDowell[8] on September 1, 2020, Ms. Burnell stated that she would be on

15   FMLA leave "until [her] thyroid stabilizes and the anxiety issue around the entire Grace

16   [Kositzky]/Covid issue is resolved."  (*Id.* ¶ 9, Ex. H.)  She alleged that Ms. Bowers

17   "overlooked and downplayed" the circumstances in which Ms. Burnell was asked to

18   work from home after reporting that Ms. Kositzky was coughing.  (*Id.*)  Ms. Burnell also

19   stated that, even though "[t]his may not be a big deal[,]" she found it "extremely hurtful

20

21   _____

         [7] The court refers to the page numbers in the CM/ECF header when citing to the exhibits
     to Ms. Bowers's declarations.

22        [8] At the time, Ms. McDowell's last name was Hoovler. She since changed her last name
     to McDowell.

1  and embarrassing" that her concerns about health and safety in the workplace were

2  ignored and that she was told to work from home. (*Id.*) She also noted that she had

3  attended eight mental health appointments since March 2020. (*Id.*) On September 15,

4  2020, Ms. Burnell emailed Ms. Bowers directly, accusing her of screaming at Ms.

5  Burnell for reporting Ms. Kositzky for coughing, and of retaliating against Ms. Burnell

6  by ordering her to work from home. (9/20/24 Bowers Decl. ¶ 15, Ex. F.)

7  　　　On October 26, 2020, in an email to Lewis Brisbois's firm-wide Chief Human

8  Resources Officer and General Counsel, Ms. Burnell accused multiple individuals at

9  Lewis Brisbois's Seattle office of "gaslighting [her] and playing games" and "fucking

10  with [her] mentally[.]" (9/20/24 Slocum Decl. ¶ 11, Ex. J.) She also complained that she

11  had "[b]een in crisis" since she was told to work from home, employing profanity

12  throughout her message:

13  　　All — never heard back, of course lol but it's super Interesting. . . . How?
    　　Funny huh? Wow! Once again keep fucking with me mentally. It's
14  　　wonderful for me.

15  　　　　　　　　　　　　　* * *

16  　　God damn why didn't Stacy [Bowers] do her job and just send Grace
    　　[Kositzky] the fuck home. This is the insane amount of bs I've had to go
17  　　thru and deal with mentally all because I spoke up on my protected right of
    　　being safe at work. All these little things that keep happening and I am left
18  　　to address with u guys is not good for my anxiety at all. My next thyroid test
    　　is November 17th and I hope I can get this horrible work issue over with bc
19  　　my stress related work bs is NOT ok. And BTW those were laws Stacy
    　　violated not just The 50 – COVID-19 company policy violations she
20  　　violated. Fucking joke.

21  　　When I come back, I'd like to take over for Stacy where I know the laws and
    　　downright human decency. And I will be starting the unionization with
22  　　OPEIU Local 8 because had I had Union protection on that day I was

retaliated against for speaking up on someone that couldn't control her
fucking cou[g]h in a god damn pandemic—are u kidding me. The union
would have handled it for me and I could have went about my life . . . u
should get the hint that I'm pissed off that I was wronged over and over
again[.]

\* \* \*

This is insane!!! As you can see I kinda need you guys to find my fucking
HSA like immediately so I can get my anxiety medication. Having to even
think about how all this has played out against me makes me sick to my
fucking stomach. . . . This is so completely insane! With everything please
let me know how I can ever step foot in that place again. I'd love to hear ur
advice. You probably think I should just be able to forget it but that's not
how trauma works. It would be like me asking you to just forget about all
these emails that I send in crisis. Been in crisis since the day those bitches
screamed at me so I'm use to it now and it just keeps getting worse and worse.

(9/20/24 Slocum Decl. ¶ 11, Ex. J.)

Ms. Burnell's physician cleared her to return to work on December 1, 2020. (*See*
9/20/24 Bowers Decl. ¶ 17, Ex. H.) On that same day, Ms. Burnell sent an email to the
entire Seattle office of Lewis Brisbois regarding her frustration with how Ms. Bowers
handled her complaint about Ms. Kositzky's cough, the anxiety that incident had caused
her, and the therapy bills she had incurred as a result. (9/20/24 Bowers Decl. ¶ 16, Ex.
G.) Ms. Burnell noted that she was including the whole office on the email "for
transparency and to ensure the Seattle team will not try to take low key jabs at my work":

Stacy [Bowers] and Team — Thanks so much for your email. I was hoping
that after ALL that has transpired from your poor decision to allow someone
in the office with an uncontrollable cough at the start of a global pandemic,
your lack of ability to simply comply with Governors Orders, [Lewis
Brisbois] Covid policies. All of those caused me to have to speak up and do
your job for you only to then be screamed at by you and Grace [Kositzky]
and the retaliation of being removed from the office to WFH on a system that
simply doesn't work — ya know the same hotspot Laura and Jonathan
couldn't work off of. To me having a mental breakdown all because of your

poor decision to stand up to Grace.  Stacy, at what point were you or are you going to address the situation at hand with the fact my systems don't work and face the fact that had you simply pulled Grace to the side and sent her home kinda like you did Chad then NONE of this would have happened. . . . So thankful that all this happened to me and I've incurred lots of therapy bills having to deal with the severe anxiety and panic that your poor decision caused.  Including all for transparency and to ensure the Seattle team will not try to take low key jabs at my work.  Side note, because my anxiety is about to flip out of control even thinking about having to work from this horrible system once again, I have a message into my therapist for a note stating I need to be in the office to perform my legal job.  Thanks all for having to read this but due to everything this caused me and the embarrassment and shame I feel from everything that never should have happened I wanted to make sure the team knew what happened and the spiral downfall it caused me.  This never should have happened at a law firm.  The nonchalant attitude you guys have all had towards a very serious situation to me is very sad but expected bc....... never address liability even at the expense of someone else, now employees.  Sad.

Yes, your actions broke me down to a point I've never been before but I have my Fingers crossed that I can keep my anxiety at bay since I'm coming back into the same situation— all I can do now is laugh, this is straight comedy, Stacy.  I feel better now that we all know what I've been dealing with for so long.  The anxiety that comes with this is wonderful and I hope you and Grace are ashamed and embarrassed of how you did me.  I'll have my therapist send you over a letter.  Thanks again for everything!  I'll be online early since it takes me about 5mins to even type an email on the wonderful system I'm forced to work with.  Sorry for my lack of integrity while writing this email but it goes hand in hand with your actions toward me.  Now that's been said, let's get to work!

(9/20/24 Bowers Decl. ¶ 16, Ex. G.)

The next day, on December 2, 2020, Ms. Jensen met with Ms. Burnell in person in Ms. Jensen's office.  (*See* 9/20/24 Jensen Decl. ¶ 6, Ex. D.)  Ms. Jensen arranged for Ms. McDowell to be present at the meeting as a witness.  (*Id.* ¶ 6.)   During that meeting, Ms. Jensen told Ms. Burnell that she "need[ed] to make sure" that Ms. Burnell knew "how to act professionally, behave professionally in the office."  (Burnell Dep. at 79:4-8, 81:3-6.)

1    At the time, Ms. Burnell was "in complete fight or flight" and felt that she was "fighting

2    for [her] life[.]"  (*Id.* at 79:9-11.)  Ms. Burnell stated that she was particularly upset that

3    Ms. Jensen did not attempt to discuss her concerns or to perform her job as a managing

4    attorney by addressing those concerns:

5            [Ms. Jensen] acted in bad faith by one, trying to not do her job as a managing
             attorney to try to help rectify this situation . . . . from finding out that I was
6            being removed because of Grace's cough, it should have fallen back on [Ms.
             Jensen] to make that decision of, Hey, Stacy, we don't . . . discriminate or
7            retaliate against people for speaking up on something . . . Grace is to go home
             and that's it.

8    (*Id.* at 87:5-21.)  Ms. Burnell was also upset that Ms. McDowell attended the meeting as

9    a witness and was "[p]resent and not helping" and "not speaking up" for Ms. Burnell or

10   "reporting what was going on."  (*Id.* at 50:3-4.)  Ultimately, the meeting with Ms. Jensen

11   sent Ms. Burnell "into a panic[.]"  (*Id.* at 81:12.)  Shortly thereafter, Ms. Burnell went to

12   the emergency room.  (9/20/24 Jensen Decl. ¶ 7, Ex. E.)

13           Ms. Burnell never returned to work after December 2, 2020.  (9/20/24 Bowers

14   Decl. ¶ 18.)  Because she had already exhausted her FMLA leave, Ms. Burnell was

15   placed on unpaid medical leave and, on February 26, 2021, became an "inactive

16   employee" of Lewis Brisbois.  (10/24/23 Bowers Decl. (Dkt. # 71) ¶ 13 Ex. G.)  As of

17   September 2023, Ms. Burnell was still on leave.[9]  (Burnell Dep. at 50:5-6.)

18

19

20

21

22   _____
     [9] The parties have not directed the court to evidence regarding the current status of Ms.
     Burnell's employment with Lewis Brisbois.

1    **B.    Procedural Background**

2        Ms. Burnell filed a charge with the Equal Employment Opportunity Commission,

3    on or about September 27, 2021, and received a notice of right to sue on December 3,

4    2021.  (*See* Compl. (Dkt. # 4) at 5, 8.)  She filed this lawsuit *pro se* on March 3, 2022.

5    (*See* IFP App. (Dkt. # 1).)  In May 2022, the court denied Ms. Burnell's first motion to

6    appoint counsel.  (5/31/22 Ord. (Dkt. # 16).)  In doing so, the court cautioned Ms. Burnell

7    that, although it would "afford some leeway to a *pro se* litigant," she was "responsible for

8    complying with case deadlines, the Federal Rules of Civil Procedure, and the Western

9    District of Washington's Local Rules[.]" (*Id.* at 2.)  Ms. Burnell amended her complaint

10   on July 1, 2022.  (Am. Compl.)

11       During discovery, Ms. Burnell again asked the court to appoint counsel.  (9/20/23

12   Mot. (Dkt. # 60).)  The court granted her request and appointed an attorney to represent

13   Ms. Burnell for the limited purpose of assisting her with alternative dispute resolution.

14   (*See* 11/22/23 Ord. (Dkt. # 75) at 2.)  The parties scheduled a mediation, to be paid for by

15   Lewis Brisbois, in early 2024.  (1/4/24 Joint Stmt. (Dkt. # 77).)  Ms. Burnell, however,

16   cancelled the mediation about two weeks before it was to occur and asked her appointed

17   counsel to withdraw.  (*See* 1/19/24 Am. Joint Stmt. (Dkt. # 78); 1/19/24 Not. (Dkt. # 79).)

18   As a result, Ms. Burnell again proceeded *pro se*.

19       Discovery ended in March 2024.  Six months later, after the court extended the

20   deadline to move for summary judgment, (8/26/24 Ord (Dkt. # 92)), the parties timely

21   filed their cross-motions for summary judgment.  (Defs. MSJ; Burnell MSJ.)  The

22   motions are now fully briefed and ripe for decision.  (*See generally* Dkt.)

1

### III.   DISCUSSION

2      Below, the court first addresses the standard of review.  Next, the court addresses

3  preliminary matters concerning Ms. Burnell's failure to provide factual support,

4  Defendants' request to strike Ms. Burnell's response and materials attached to Ms.

5  Burnell's replies, and Ms. Burnell's duplicate and late-filed replies.  Finally, the court

6  addresses the substance of the parties' cross-motions for summary judgment.

7  **A.     Standard of Review**

8      The court must grant a motion for summary judgment when, viewing the evidence

9  in the light most favorable to the nonmoving party, "the movant shows that there is no

10  genuine dispute as to any material fact and the movant is entitled to judgment as a matter

11  of law."  Fed. R. Civ. P. 56(a); *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 216

12  (2015).  A fact is material if it "might affect the outcome of the suit under the governing

13  law[,]" and a dispute is genuine when "the evidence is such that a reasonable jury could

14  return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

15  242, 248 (1986).  Thus, a party cannot defeat summary judgment by relying only upon

16  "mere conclusory allegations," *Opara v. Yellen*, 57 F.4th 709, 728-29 (9th Cir. 2023)

17  (cleaned up), or upon a version of events that "is blatantly contradicted by the record[.]"

18  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Likewise, "[d]isputes over irrelevant or

19  unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec. Serv., Inc.*

20  *v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

21      In the context of employment discrimination, the Ninth Circuit has "emphasized

22  the importance of zealously guarding an employee's right to a full trial, since

discrimination claims are frequently difficult to prove without a full airing of the

evidence[.]" *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004).

Accordingly, there is a "high standard" for granting summary judgment in employment

discrimination cases, and "very little evidence" is needed to survive summary judgment.

*Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996).  Nevertheless, in

ruling on a motion for summary judgment, the court "may only consider admissible

evidence[,]" *Ballen v. City of Redmond*, 466 F.3d 736, 745 (9th Cir. 2006), and a party

may object at the summary judgment stage if any "material cited to support or dispute a

fact cannot be presented in a form that would be admissible in evidence."[10]  Fed. R. Civ.

P. 56(c)(2).

In sum, to demonstrate a genuine dispute of material fact, the nonmoving party

must provide more than just allegations and argument; it must "cit[e] to particular parts of

materials in the record" to support its position, including depositions, documents,

affidavits or declarations, or other record materials.  Fed. R. Civ. P. 56(c)(1)(A).

Ultimately, summary judgment is appropriate when a party "fails to make a showing

sufficient to establish . . . an element essential to that party's case, and on which that

party will bear the burden of proof at trial."  *Id.* at 324; *see also Triton Energy Corp. v.*

*Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("[S]ummary judgment should be

granted where the nonmoving party fails to offer evidence from which a reasonable jury

could return a verdict in its favor.").

---

[10] Although the court need only consider materials that are cited by a party, it has
discretion to "consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

1    **B.    Preliminary Matters**

2        Before turning to the substance of the parties' cross motions for summary

3    judgment, the court addresses three preliminary issues: (1) Ms. Burnell's failure to

4    provide evidentiary support for her summary judgment arguments; (2) Defendants'

5    requests to strike Ms. Burnell's late-filed response to their motion for summary judgment

6    and text messages attached to Ms. Burnell's replies; and (3) Ms. Burnell's duplicate and

7    late-filed replies.

8        1.    Ms. Burnell's Failure to Provide Evidentiary Support

9        Defendants argue that they are entitled to summary judgment because Ms. Burnell

10   has not presented admissible evidence to generate a genuine issue of material fact with

11   respect to her claims. (Defs. Reply at 2-3.) If a party fails, under Federal Rule of Civil

12   Procedure 56(c), to properly support its assertion of fact or to address another party's

13   assertion, the court may take one of several actions, including "(1) giv[ing] an

14   opportunity to properly support or address the fact; (2) consider[ing] the fact undisputed

15   for purposes of the motion; (3) grant[ing] summary judgment if the motion and

16   supporting materials … show that the movant is entitled to it; or (4) issu[ing] any other

17   appropriate order." Fed. R. Civ. P. 56(e).

18       The court agrees with Defendants that Ms. Burnell did not cite to any admissible

19   evidence in the record at the summary judgment stage, nor did she properly attach

20   supporting declarations or admissible evidence to any of her summary judgment papers.

21   (*See generally* Burnell MSJ; Burnell Resp.; Burnell Reply.) "[P]ro se litigants, whatever

22   their ability level, are subject to the same procedural requirements as other litigants."

*Muñoz v. United States*, 28 F.4th 973, 978 (9th Cir. 2022). And Ms. Burnell is not a typical *pro se* litigant: although she is proceeding *pro se*, Ms. Burnell is an experienced legal secretary. The court informed Ms. Burnell that she would be responsible for complying with the Federal Rules of Civil Procedure, and provided her with instructions for accessing materials to assist *pro se* litigants. (5/31/22 Ord.) Further, Ms. Burnell has demonstrated in this case that she knows how to support her arguments with declarations. (*See, e.g.*, 6/13/22 Mot. (Dkt. # 22); 10/23/23 Mot. (Dkt. # 64).) Thus, to address Ms. Burnell's failure to provide support, the court will treat the facts properly in the record as undisputed and will assess the parties' cross-motions for summary judgment accordingly.

2.  Defendants' Requests to Strike

Defendants also ask the court to (1) disregard Ms. Burnell's late-filed response to their motion for summary judgment and (2) strike the pages of text messages attached to Ms. Burnell's reply in support of her motion for summary judgment as inadmissible hearsay, irrelevant, and substantially more prejudicial than probative. (Defs. Reply at 1-2; Defs. Surreply at 3-4.) The court denies Defendants' first request and grants the second.

*First*, as to Ms. Burnell's late-filed response, Defendants argue that they were "prejudiced by the untimely filing because they had three – rather than seven – days to prepare [their] reply[,]" and they request that the court disregard Ms. Burnell's response.[11] (Defs. Reply at 1.) The court has discretion to disregard or strike untimely

---

[11] Under Local Civil Rule 7(d)(4) opposition papers to a motion for summary judgment must be filed "no later than 21 days after the filing date of the motion." *See* Local Rules W.D.

1    filings, especially when the opposing party is prejudiced.  *Cf. Howard v. Patenaude &*
2    *Felix APC*, 634 F. Supp. 3d 990, 997 n.1 (W.D. Wash. 2022) (discussing striking
3    untimely declarations).  Here, however, Defendants were able to submit a timely and
4    complete reply in support of their motion for summary judgment despite their limited
5    time, and they have not explained how they were otherwise prejudiced.  The court
6    accordingly exercises its discretion to consider Ms. Burnell's response.

7         *Second*, Defendants move to strike what appear to be printed pages of text
8    messages that Ms. Burnell attached to the first, second, and seventh copies of her reply in
9    support of her motion for summary judgment.  (Defs. Surreply at 3-4; *see* Burnell Reply;
10   2d Burnell Reply (Dkt. # 116); 7th Burnell Reply (Dkt. # 121)).  Ms. Burnell did not
11   include a declaration explaining the nature of the attachments or attesting to their
12   authenticity.  She also did not cite to or otherwise reference any of the attachments.  (*See*
13   *generally* Burnell Reply.)  Defendants ask the court to strike these text messages as (1)
14   irrelevant; (2) inadmissible hearsay; and (3) substantially more prejudicial than probative
15   because they involve offensive, profane, and threatening language, and largely comprise
16   "cruel co-worker gossip about other co-workers[,]" several of whom are not parties to
17   this lawsuit.  (Defs. Surreply at 3-4.)

18        Under Federal Rule of Civil Procedure 56(c)(2), a party "may object that the
19   material cited to support or dispute a fact cannot be presented in a form that would be

---

Wash. LCR 7(d)(4).  The Defendants' motion was filed on September 20, 2024, (Defendants'
MSJ), meaning that a response was due on October 11, 2024.  Ms. Burnell's response, however,
was filed on October 15, 2024.  (Burnell Resp.)  The court will exercise its discretion to consider
Ms. Burnell's response, even though it was filed late.

admissible in evidence." Fed. R. Civ. P. 56(c)(2).  Evidence must be relevant to be

admissible.  *See* Fed. R. Evid. 401, 402.  And hearsay, which is generally defined as an

out of court statement "offer[ed] in evidence to prove the truth of the matter asserted[,]"

*see* Fed. R. Evid. 801(c), is typically inadmissible unless an exception applies.  *See* Fed.

R. Evid. 802.  Even relevant evidence may be excluded "if its probative value is

substantially outweighed by a danger of . . . unfair prejudice, confusing the issues,

misleading the jury, undue delay, wasting time, or needlessly presenting cumulative

evidence."  Fed. R. Evid. 403.

　　Here, Ms. Burnell does not explain the relevance of any of her attachments to her

reply, cite to the attachments, or support the authenticity of the attachments through a

declaration.  (*See generally* Burnell Reply.)  Having reviewed the text messages, the

court concludes that they appear to be hearsay, substantially more prejudicial than

probative, and irrelevant to the matters in dispute.  Accordingly, the court will strike the

attachments to Ms. Burnell's reply.

　　3.　Ms. Burnell's Duplicate and Late-Filed Replies

　　As a final preliminary matter, the court exercises its discretion to strike Ms.

Burnell's duplicate and late-filed replies and their attachments.

　　Although "*pro se* parties are afforded substantial lenience, they must comply with

the Local Rules." *Jutla v. Redfin Corp.*, No. C24-0464KKE, 2024 WL 4438113, at *2

n.1 (W.D. Wash. Sept. 16, 2024).  "The [c]ourt has discretion to strike untimely and

duplicative briefings that fail to do so." *Id.* (citations omitted)).

1    Here, after Ms. Burnell filed her original reply brief in support of her motion for

2    summary judgment (*see generally* Burnell Reply), she filed six identical copies of her

3    reply over the course of three days. (*See* Dkt. ## 116-121.) Five of these submissions

4    were untimely,[12] and all six duplicate her first submission. (*Id.*) Each copy of Ms.

5    Burnell's reply includes a different set of attachments, and together the attachments

6    number over 700 pages. (*See* Dkt. ## 115-121.) Ms. Burnell does not cite or refer to any

7    of these attachments. Accordingly, the court exercises its discretion to strike Ms.

8    Burnell's untimely and duplicate replies.

9    **C.    The Parties' Cross-Motions**

10    The court now turns to the parties' cross-motions for summary judgment. As to

11    Ms. Burnell's own motion for summary judgment, she must "show[] that there is no

12    genuine dispute as to any material fact" and that she "is entitled to judgment as a matter

13    of law." Fed. R. Civ. P. 56(a). Because Ms. Burnell did not attach or cite to any

14    admissible evidence to support her motion for summary judgment (*see generally* Burnell

15    MSJ; Burnell Reply), the court concludes that she has not met her Rule 56(a) burden and

16    denies her motion.

17

18

19

20    ―――――――――――

      [12] Under Local Civil Rule 7(d)(4) any reply papers supporting a motion for summary
      judgment must be filed "no later than 28 days after the filing date of the motion." *See* Local
21    Rules W.D. Wash. LCR 7(d)(4). Ms. Burnell's motion was filed on September 20, 2024,
      (Burnell MSJ), meaning that her reply was due on October 18, 2024. Ms. Burnell filed her first-
      and second-filed replies on that date. (Dkt. ## 115-116.) She filed the remaining five copies of
22    her reply, however, either one day late (Dkt. ## 117-119), or two days late (Dkt. ## 120-121).

1    Turning to the Defendants' motion for summary judgment, the court discusses the

2    elements of each of Ms. Burnell's claims and assesses whether Defendants have met their

3    own Rule 56(a) burden.

4    1.  <u>Statutory Employment Claims</u>

5    Ms. Burnell raises four statutory claims under state and federal law:  (1) disability

6    discrimination, (2) failure to accommodate, (3) disability-based harassment, and

7    (4) retaliation.  The court concludes that Defendants are entitled to judgment as a matter

8    of law on all of these claims.

9    *a.    Disability Discrimination*

10    Although Ms. Burnell's position is not entirely clear, the court understands that

11    Ms. Burnell asserts that Defendants discriminated against her on the basis of a disability

12    on two occasions:  (1) when Ms. Bowers told her to work from home on April 10, 2020;

13    and (2) when Ms. Jensen told her to act professionally in the office during the December

14    2, 2020 meeting.  (Burnell Resp. at 21.)  The Americans with Disabilities Act ("ADA")

15    and the Washington Law Against Discrimination ("WLAD") prohibit employers from

16    discriminating against employees in the "terms, conditions, and privileges of

17    employment" because of an employee's disability.  *See* 42 U.S.C. § 12112(a); RCW

18    49.60.180.  To establish a *prima facie* case of disability discrimination, a plaintiff must

19    offer admissible evidence that he or she (1) is disabled within the meaning of the relevant

20    statutes; (2) is qualified to perform the essential functions of his or her job; and

21    (3) "suffered an adverse employment action because of her disability."  *See Snead v.*

22

ORDER - 21

*Metrop. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001).[13]  The third element

can be established through direct evidence "demonstrating that a discriminatory reason"

motivated an employer's conduct.  *See Opara*, 57 F.4th at 721.  Alternatively, the

plaintiff can establish a *prima facie* case under the burden-shifting framework set forth in

*McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802 (1973), by showing either that

"similarly situated individuals outside [the employee's] protected class were treated more

favorably, or other circumstances surrounding the adverse employment action give rise to

an inference of discrimination."  *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603

(9th Cir. 2004) (citing *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123

(9th Cir. 2000)).[14]

Applying these standards to the competent evidence here, the court concludes that

there is no genuine dispute of material fact as to whether Ms. Burnell suffered an adverse

action *because of* her disability.  To the contrary, the competent evidence in the record

demonstrates only that Defendants engaged in the allegedly-discriminatory conduct for

other, non-discriminatory reasons.  Ms. Burnell has not identified any evidence to rebut

Ms. Bowers's explanation that she told Ms. Burnell to work from home in April 2020

---

[13] The WLAD largely tracks federal law, and courts "look to interpretations of federal anti-discrimination laws, including the ADA, when applying the WLAD."  *Grill v. Costco Wholesale Corp.*, 312 F. Supp. 2d 1349, 1354 (W.D. Wash. 2004).

[14] Under the *McDonnell Douglas* framework, if a plaintiff establishes a *prima facie* case of discrimination, "the burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action."  *Hawn v. Executive Jet Mgmt.*, 615 F.3d 1151, 1155 (9th Cir. 2010) (cleaned up).  If the employer meets this burden, the plaintiff "must then raise a triable issue of material fact as to whether the defendant's proffered reasons . . . are mere pretext for unlawful discrimination."  *Id.*

1    because Ms. Burnell was not an essential employee or a member of Lewis Brisbois's

2    skeleton crew, and thus, like all other such employees, was required to work from home.

3    (9/20/24 Bowers Decl. ¶ 8.)  Nor has Ms. Burnell identified any evidence contradicting

4    Ms. Jensen's explanation that she scheduled the December 2, 2020 meeting to discuss

5    Ms. Burnell's professionalism following Ms. Burnell's accusatory and profane emails.

6    (*See* 9/20/24 Slocum Decl. ¶ 11, Ex. J.; 9/20/24 Bowers Decl. ¶ 16 Ex. G.; 9/20/24 Jensen

7    Decl. ¶ 6, Ex. D.; *see also* Burnell Dep. at 79:4-8, 81:5-6 (Ms. Burnell's testimony that

8    Ms. Jensen stated, "I need to make sure that you are going to act professionally, behave

9    professionally").)  As a result, the court concludes that Ms. Burnell has not met her

10   burden to establish a genuine issue of fact as to her disability discrimination claim and

11   grants Defendants' motion for summary judgment on that claim.

12                    b.    *Failure to Accommodate*

13           With respect to her failure to accommodate claim, Ms. Burnell argues that she was

14   initially allowed to work in the office as a reasonable accommodation for a disability, and

15   that Defendants removed this accommodation without justification when Ms. Bowers

16   told Ms. Burnell to work from home.  (*See* Burnell Resp. 21.)  "Both the ADA and the

17   WLAD require an employer to reasonably accommodate an employee with a disability."

18   *Hotchkiss v. CSK Auto Inc.*, 918 F. Supp. 2d 1108, 1123 (E.D. Wash. 2013);

19   42 U.S.C. § 12112(b)(5).  To make out a *prima facie* case of failure to accommodate, Ms.

20   Burnell must show that she (1) had a disability as defined by the ADA or WLAD; (2) was

21   qualified to perform the essential functions of the job; (3) gave the employer notice of the

22   disability and its limitations; and (4) upon notice, the employer failed to adopt available

1    measures to accommodate the disability.  *See Hylinger v. Union Pacific R.R.*, 538 F.

2    Supp. 2d 1325, 1330-31 (W.D. Wash. 2008); *Davis v. Microsoft Corp.*, 70 P.3d 126, 131

3    (Wash. 2003).

4        Here, the only competent evidence in the record demonstrates that Ms. Burnell's

5    ability to work from the office in March 2020 was not an accommodation for a disability.

6    Instead, as Ms. Burnell acknowledges, she volunteered to work from the office to catch

7    up on her work, to avoid remaining at home, and because she did not have the technology

8    needed to succeed while working remotely.  (*See* Burnell Dep. at 68:6-8, 71:20-25;

9    9/20/24 Slocum Decl. ¶ 3, Ex. B (March 16, 2020 email from Ms. Burnell to Lewis

10   Brisbois staff, stating "I have volunteered to come in to the office and not work at

11   home").)  Further, although Ms. Burnell asserts that Defendants "were put on notice that

12   [she] was struggling with mental health issues from after [her] mother's passing in

13   November of 2019 and all the way through December 2, 2020[,]" she presents no

14   competent evidence to support that assertion.  (*See* Burnell Resp. at 21.)

15       To the contrary, the only competent evidence in the record, viewed in the light

16   most favorable to Ms. Burnell, shows that Ms. Burnell gave Defendants notice of a

17   disability, at the earliest, in her August 27, 2020 email message to Ms. Bowers.  (*See*

18   9/20/24 Bowers Decl. ¶ 12, Ex. E.; 10/18/24 Bowers Decl. (Dkt. # 114) ¶ 3.)  In that

19   message, Ms. Burnell did not ask to work from the office as an accommodation, but

20   rather asked "the firm to go to bat for me while I take time off[.]"  (9/20/24 Bowers Decl.

21   ¶¶ 12-13, Ex. E.)  Defendants then granted Ms. Burnell's request for leave:  she began

22   FMLA leave a few days later, on September 1, 2020.  (*Id.* ¶¶ 13-14.)  Because no

reasonable juror could find, based on the evidence in the record, that Defendants failed to accommodate Ms. Burnell's disability, the court grants Defendants' motion for summary judgment on her failure to accommodate claim.

### c.    *Disability-Based Harassment*

Ms. Burnell argues that she was "subjected to harassment and pestering by coworkers about [her] inability to complete work on time." (Burnell Resp. at 21.) The court also understands that Ms. Burnell contends that Ms. Jensen and Ms. McDowell met with her on December 2, 2020 to harass her for being disabled (*see* Burnell Reply at 4) and that Ms. Bowers harassed her after allegedly yelling at her for reporting Ms. Kositzky's coughing in April 2020. (Burnell MSJ at 4-5.) To establish a claim for disability-based harassment, Ms. Burnell must show that she "was subjected to harassment because of [her] disability, and that the harassing conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment." *Mattioda v. Nelson*, 98 F.4th 1164, 1174 (9th Cir. 2024) (citation and quotation marks omitted).

Ms. Burnell has not identified, and the court has not found, any competent evidence in the record from which a reasonable jury could find that Ms. Burnell was harassed *because of* a disability. Indeed, Ms. Burnell admits that any perceived "harassment and pestering" by her coworkers was because of her failure "to complete work on time"—that is, not because she was disabled. (*See* Burnell Resp. at 21.) Accordingly, the court grants Defendants' motion for summary judgment on Ms. Burnell's disability-based harassment claims.

1                    d.    *Retaliation*

2          Finally, Ms. Burnell argues that she suffered retaliation for reporting Ms. Kositzky

3    for coughing when Ms. Bowers told her to work from home and when Ms. Jensen told

4    her to act professionally in the office.[15]  (Burnell Resp. at 22.)  To establish a *prima facie*

5    case of retaliation, Ms. Burnell must demonstrate that (1) she engaged in a protected

6    activity, (2) she suffered an adverse employment action, and (3) that there was a "causal

7    link" between the two.  *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th

8    Cir. 2002); *see also Francom v. Costco Wholesale Corp.*, 991 P.2d 1182, 1191 (Wash.

9    Ct. App. 2000) (noting that the same elements apply under the WLAD).  A plaintiff

10   "engage[s] in protected activity if she oppose[s] an employment practice based on a

11   reasonable belief that the practice was unlawful[,]" even if the opposed practice was not

12   actually unlawful.  *See Erickson v. Biogen, Inc.*, 417 F. Supp. 3d 1369, 1382 (W.D.

13   Wash. 2019) (citing *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir.

14   1983)).  In the context of retaliation, an adverse employment action is "any adverse

15   treatment that is based on a retaliatory motive and is reasonably likely to deter the

16   charging party or others from engaging in a protected activity."  *Little v. Windermere*

17

18          [15] For the first time, in her response to Defendants' motion for summary judgment, Ms.
     Burnell argues that Defendants also retaliated against her for taking FMLA leave by stopping
19   payment on her August 31, 2020 paycheck.  (Burnell Resp. at 14.)  A court, however, need not
     address allegations raised for the first time in response to a motion for summary judgment if the
     plaintiff's "pleadings did not provide sufficient notice of those allegations." *Pickern v. Pier 1*
20   *Imports (U.S.), Inc.*, 457 F.3d 963, 965, 968-69 (9th Cir. 2006) (affirming district court's refusal
     to address new "issues of ADA violations" that were raised for the first time in response to a
21   motion for summary judgment and that were not included in the complaint).  Here, Ms. Burnell's
     amended complaint does not even hint at this retaliation theory:  her complaint includes no
     mention of retaliation for taking FMLA leave or that Defendants allegedly failed to pay her.
22   (*See generally* Am. Compl.)  Accordingly, the court will not address this new argument.

1    *Relocation, Inc.*, 301 F.3d 958, 970 (9th Cir. 2002) (citation and quotation marks

2    omitted).

3         Here, there is at least a triable issue of fact on the first element of retaliation:

4    whether Ms. Burnell engaged in protected activity when she reported Ms. Kositzky.

5    Reviewing the record in the light most favorable to Ms. Burnell, a reasonable juror could

6    find that Ms. Burnell reasonably believed that she was opposing an unlawful employment

7    practice when she complained, against the backdrop of the COVID-19 pandemic and

8    Governor Inslee's stay-at-home order, that Ms. Kositzky was working at the office while

9    coughing. (*See* Burnell Dep. at 87:14-21; 9/20/24 Bowers Decl. ¶ 15, Ex. F (September

10   1, 2020 email from Ms. Burnell to Mr. Worden and Ms. McDowell).)

11        Nevertheless, summary judgment for the Defendants is warranted on Ms.

12   Burnell's retaliation claim because Ms. Burnell has failed to identify competent evidence

13   demonstrating a causal link between her decision to report Ms. Kositzky and any adverse

14   action. Instead, as the court explained above, the only admissible evidence in the record

15   demonstrates that (1) Ms. Bowers told Ms. Burnell to work at home pursuant to Lewis

16   Brisbois's COVID-19 policy and Governor Inslee's proclamations, and (2) Ms. Jensen

17   and Ms. McDowell met with Ms. Burnell to instruct her to communicate professionally in

18   the office after she sent accusatory and profane emails to coworkers. (9/20/24 Slocum

19   Decl. ¶ 8, ¶ 11, Ex. J.; 9/20/24 Bowers Decl. ¶ 16 Ex. G.; 9/20/24 Jensen Decl. ¶ 6, Ex.

20   D.; Burnell Dep. at 79:4-8, 81:5-6.) Therefore, the court grants Defendants' motion for

21   summary judgment on Ms. Burnell's retaliation claim.

22

1

2.  <u>Common Law Claims</u>

2

Additionally, Ms. Burnell raises common-law claims for negligent hiring or

3

retention and intentional infliction of emotional distress.  (*See* Am. Compl. at 2.)  She

4

also raises claims that she describes as follows:

5

> [V]erbal assault, violation of direct threat of communicable diseases,
> violation of right to safe workplace, bad faith, professional negligence, . . .

6

> proximity bias, . . . oppression in the workplace, . . . [and] loss of privilege
> to Human Rights[.]

7

(Am. Compl. at 2.)[16]

8

As to her negligent hiring or retention claims, Ms. Burnell argues only that

9

Defendants were negligent in hiring and retaining Ms. McVay.  (Burnell Resp. at 22-23.)

10

"[T]o hold an employer liable for negligently hiring or retaining an employee who is

11

incompetent or unfit, a plaintiff must show that the employer had knowledge of the

12

employee's unfitness or failed to exercise reasonable care to discover unfitness before

13

hiring or retaining the employee."  *Anderson v. Soap Lake Sch. Dist.*, 423 P.3d 197, 206

14

(Wash. 2018).  A plaintiff must also show that the employer "knows or should know"

15

that the employee is "so incompetent, inappropriate, or defective" that hiring or retaining

16

the employee "involves an unreasonable risk of harm to others."  *See id.* (quoting

17

Restatement (Second) of Torts § 307 (Am. Law Inst. 1965)).  The incompetence or

18

unfitness of the employee must proximately cause the plaintiff's injury.  *Rucshner v.*

19

*ADT, Sec. Sys., Inc.*, 204 P.3d 271, 278 (Wash. Ct. App. 2009).

20

21

_____

22

[16] The court has already dismissed Ms. Burnell's claims arising under 42 U.S.C. § 1983.
(*See* 7/11/22 Ord. (Dkt. # 40) at 9-11.)

1    Defendants are entitled to summary judgment on Ms. Burnell's negligent hiring

2    claim.  There is no evidence in the record that Ms. McVay was incompetent or unfit for

3    her position, let alone any evidence that Defendants knew or should have known Ms.

4    McVay was incompetent or unfit.  To the contrary, the record evidence shows only that

5    Lewis Brisbois employees must undergo a background check before hiring—including

6    confirming prior employment and checking references—and that Ms. McVay was

7    qualified for her position at Lewis Brisbois and that she quit and was not fired.  (10/18/24

8    Bowers Decl. ¶¶ 4-6.)  Further, Ms. Burnell never explains what harm she suffered

9    because of Ms. McVay's alleged unfitness.  (*See generally* Burnell Resp.)

10    As to her intentional infliction of emotional distress claim, Ms. Burnell argues

11    simply that she suffered severe emotional distress while working at Lewis Brisbois.

12    (Burnell Resp. at 23.)  Ms. Burnell does not specify which of Defendants' acts caused her

13    this distress (*see id.*), but it appears to the court that Ms. Burnell is likely referring to Ms.

14    Bowers's instruction to work from home and Ms. Jensen's instruction to communicate

15    professionally.  To prevail on her claim, Ms. Burnell must show (1) "extreme and

16    outrageous conduct," (2) "intentional or reckless infliction of emotional distress," and

17    (3) "that [she] actually suffers severe emotional distress."  *Chaudhry v. Day*, 548 P.3d

18    279, 282 (Wash. Ct. App. 2024).  Extreme and outrageous conduct must be "so

19    outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

20    decency, and to be regarded as atrocious, and utterly intolerable in a civilized

21    community."  *Grange Ins. Ass'n v. Roberts*, 320 P.3d 77, 86 (Wash. Ct. App. 2013)

22    (citation and quotation marks omitted).

1    There is nothing in the record, alone or in combination, that approaches

2    "outrageous" conduct that is "atrocious and utterly intolerable in a civilized community."

3    *Id.*  No reasonable jury could find that instructing a non-essential employee to work from

4    home during the COVID-19 pandemic—after Governor Inslee issued a stay-at-home

5    order requiring just that—is outrageous.  Likewise, no reasonable jury could find it

6    outrageous and intolerable that Ms. Jensen and Ms. McDowell met with Ms. Burnell in

7    December 2020, and that Ms. Jensen told Ms. Burnell to act professionally after Ms.

8    Burnell sent multiple accusatory and profane emails to her co-workers, and after she

9    emailed the entire Seattle office of Lewis Brisbois to publicly criticize Ms. Bowers.

10    Finally, as to Ms. Burnell's additional claims, she asserts only that "there are

11    triable issues of material fact[,]" without further explanation.  (*See* Burnell Resp. at 23)

12    (emphasis omitted).  As Defendants point out, Ms. Burnell does not have a bad faith or

13    professional negligence claim as a matter of law.  (Defs. MSJ at 19; Defs. Reply at 11.)

14    The former is a cause of action against an insurer, *see Griffin v. Allstate Ins. Co.*, 29 P.3d

15    777, 783-84 (Wash. Ct. App. 2001), and the latter requires an attorney-client relationship.

16    *See Spencer v. Badgley Mullins Turner, PLLC*, 432 P.3d 821, 829 (Wash. Ct. App. 2018).

17    And as to her remaining claims, Ms. Burnell does not cite any authority to show that

18    these claims are cognizable under state or federal law, and the court has not found any

19    such authority in its own research.  Accordingly, the court grants summary judgment in

20    favor of Defendants on these claims.

21    //

22    //

ORDER - 30

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

## IV.    CONCLUSION

For the foregoing reasons, the court DENIES Ms. Burnell's motion for summary judgment (Dkt. # 100) and GRANTS Defendants' motion for summary judgment (Dkt. # 96) as to all Ms. Burnell's claims.

The court further STRIKES the attachments to Ms. Burnell's reply in support of her motion for summary judgment (Dkt. # 115) and STRIKES Ms. Burnell's duplicate replies and their attachments (Dkt. ## 116-121).

Dated this __18th__ day of November, 2024.

JAMES L. ROBART
United States District Judge

ORDER - 31